JEANNETTE HIMMEL *v.* L. MANUEL
HENDLER ET AL.
[No. 38, April Term, 1931.]

*Decided June 11th, 1931.*

182

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Sylvan Hayes Lauchheimer* and *Joseph S. Goldsmith,* for the appellant.

*C. Alexander Fairbank* and *Joseph Addison,* with whom was *M. Henry Goldstone* on the brief, for the appellees.

Digges, J., delivered the opinion of the Court.

The question presented for determination by this appeal is: Does the structure proposed to be erected by the appellees (defendants below) violate the restrictive covenant contained in the deed under which they hold? The chancellor determined that it did not, and dismissed the bill of complaint which sought to enjoin the defendants from erecting the proposed fence. From that action the plaintiff appealed.

The facts necessary for an understanding of this question may be stated as follows: The plaintiff and defendants are the owners of adjoining lots fronting on Lake Drive in Baltimore City. These properties are located in a beautiful residential section, and are each improved by handsome dwellings. Both of the parties derive their title from a common source, one Michael Stein; the plaintiff acquiring her lot from Stein by mesne conveyances, while the deed of the defendants for their lot came directly from Stein. On November 15th, 1920, Stein, at that time being the owner of both lots, conveyed the lot now belonging to the plaintiff to Samuel Blum. This deed, after describing the lot conveyed, contained the following provision: "This deed made subject to the covenants, conditions and restrictions agreed upon between parties of the first and second parts hereto, which are hereby specifically agreed to by the said parties of the first and second part, and

which are intended by the parties hereto to be covenants running with and binding the respective properties of the parties hereto as herein specified or referred to and which are as follows: The said grantee covenants and agrees for himself, his heirs and assigns, that he and they will leave open and not build thereon the strip of land ten feet wide along the entire westernmost side of the lot herein described adjoining the remaining portion of the said whole tract conveyed as aforesaid by William L. Straus and wife to the parties of the first part hereto by deed dated June 1st, 1920, and recorded among the Land Records of Baltimore City in Liber S. C. L. No. 3595, folio 22, etc., retained by the said parties of the first part hereto so that said ten feet of the land shall always remain open and not be built upon and that the said grantee, his heirs and assigns, will not at any time hereafter construct, erect, or cause or permit to be constructed or erected on any part or portion of the land conveyed hereby any building or structure to be used for any purpose other than a private dwelling and no such building or structure shall exceed four stories in height, and accordingly said grantee covenants and agrees for himself, his heirs and assigns, that he and they will not any time hereafter construct or erect or cause or permit to be constructed or erected on any part or portion of the land hereby conveyed any store, shop, factory, or any building or structure of any kind or character whatsoever other than for private dwelling purposes only and not exceeding four stories in height, but nothing herein contained shall be construed as restricting or prohibiting the use of such four-story dwelling as and for an apartment house. Said grantors who are the owners of the remaining portion of the lot of ground conveyed as aforesaid by William L. Straus and wife to the parties of the first part above referred to, being the portion thereof not comprised in the lines of the lot hereby conveyed, hereby covenant and agree for themselves, their heirs and assigns, that they will leave open and not build upon the strip of land ten feet wide along the entire easternmost side of said remaining portion and adjoining the said ten-foot strip hereinbefore agreed to be similarly left

open by the grantee. And the grantors further covenant and agree for themselves and their heirs and assigns that they will not at any time hereafter construct or erect or cause or permit to be constructed or erected on any portion of the said remaining part of said lot conveyed to them as aforesaid by William L. Straus and wife any building ·or structure to be used for any purpose other than a private dwelling and no such building or structure shall exceed four stories in height. And the said grantors accordingly hereby further covenant and agree for themselves, their heirs and assigns, that they will not at any time hereafter construct or erect or cause or permit to be constructed or erected on any part of the remaining portion of said lot conveyed by William L. Straus and wife to them as aforesaid any store, shop, factory, building or structure of any kind or character whatsoever other than one for private dwelling purposes only not exceeding four stories in height, but nothing herein contained shall be construed as restricting or prohibiting the use of such four-story dwelling as and for an apartment house,"

On May 2nd, 1927, Stein and wife conveyed to the appellees that lot which was made subject to the restrictions and covenants contained in the aforesaid deed to Blum. It appears, therefore, that at the time these proceedings were instituted the appellant owned the lot conveyed by the Blum deed, and the appellees owned the lot adjoining, subject to the covenants agreed to by Stein in the Blum deed. The greatest depth of these two lots is from a northerly to southerly direction, fronting on Lake Drive and running to an alley in the rear, the division line between them being approximately 129 feet 9½ inches in length. The appellant's property lies east of the division line, and the appellees' lot west of said line. It will therefore be seen that, by covenants binding upon the parties hereto, there is a strip of land extending from Lake Drive to the before-mentioned alley twenty feet wide, ten feet on either side of said divisional line, which the parties have agreed by said covenants to "leave open and not build" upon, so that said twenty feet of land shall always

remain open and not be built upon; this covenant being binding upon the appellant in respect to the ten-foot strip east of said divisional line, and binding upon the appellees in respect to the ten-foot strip west of said line. At the time the appellees purchased their lot from Stein, he was living in a dwelling house located upon that lot. At the time the appellant purchased her lot, there was no building or improvement thereon. On the south line of the appellant's lot, separating it from the alley, there was an iron picket fence. This fence extended along the end of the appellant's restricted ten-foot strip, while along the appellees' south line there were a number of posts fastened with wire, and hedge growing so as to obscure the posts; and this fence or hedge extended along the south end of the appellees' restricted ten-foot strip. It is alleged by the bill and admitted by the answer that the appellees have had certain trenches dug in said strip belonging to them, and along the boundary line between the two lots, and have had laid down a foundation and propose to erect on said foundation and along the boundary line between the two lots, for a distance of approximately forty feet from the rear of said lots, and also along the rear of said ten-foot strip at the alley, and across said ten-foot strip at approximately forty feet from the rear of said lot, a brick fence approximately three feet high, brick posts spaced about eight feet apart, with a paling or lattice fence between said posts; that they contemplate using the rear of said ten-foot strip on their own lot, together with other adjoining parts of said lot, as a service yard for the hanging of clothes while drying, and for other uses usual to a dwelling house and service yard; that the proposed service yard extends only approximately forty feet from the alley, and does not extend to a point opposite the residence of the appellant. In other words, what the appellees propose to do is to build a fence of the character above mentioned along the southern end of their lot, running in an easterly direction, binding on the alley, to the divisional line, then in a northerly direction with the divisional line for a distance of forty feet, then in a westerly direction across the restricted strip to the appellees' dwelling. This proposal,

if carried out, would inclose in the service yard a portion of the restricted area ten feet wide and forty feet long. Their grantor, Stein, covenanted (which covenant is binding upon the appellees) that he, his heirs and assigns, would leave open and not build upon the strip of land ten feet wide along the entire easternmost side of said remaining portion and adjoining the said ten-foot strip hereinbefore agreed to be similarly left open by the grantee.

The record further discloses that the appellant has utilized the southern part of her restricted ten-foot strip by laying a concrete pavement thereon, used in driving and turning automobiles going in and out of her garage, which is situated on the unrestricted part of her lot. She has also constructed at the south end of the divisional line, on the restricted strip, a brick post approximately six feet high and two feet square. From this post she has constructed a concrete coping on her side, and adjoining the division line over the restricted area, slightly less than forty feet, then across her restricted ten-foot strip in the direction of her dwelling. This coping incloses or marks the concrete pavement, and, according to the testimony, was put there for the twofold purpose of preventing machines from encroaching upon the appellees' lawn, and also to prevent the falling away of the appellees' soil. The top of this coping is practically flush with the appellees' lawn, but the appellant's concrete pavement is several inches lower, and slopes slightly in all directions towards the center, where there is a catch-basin for drainage. The house on the appellant's lot is not built exactly parallel with the divisional line, but is placed on an angle, so that the front corner on the house is at the edge of the strip, and then recedes from it as it proceeds towards the back. The cornice at the corner of the porch of the house, which is built on the strip side of the lot, extends over the strip about an inch. In the summer awnings are swung over the strip from this side porch. The restricted strip, back to the concrete pavement or driveway, is adorned with shrubbery. The distance from the rear of the porch to the proposed wall or fence, at its nearest point, is approximately forty feet. This testimony shows the use

which the appellant has made of the restricted strip comprising the west portion of her lot.

The question simply and plainly stated, therefore, is: After the completion of the appellees' proposal, will the entire strip covered by the restrictions binding upon them be "left open and not built upon?" We have been referred to no case, and, after a diligent investigation, we have found none, in which the restrictive words were the same as here used. When by deed a grantor imposes a restriction upon the land, or any portion thereof, conveyed to the grantee, for the benefit of the land retained, or imposes such restriction upon the land retained for the benefit of that granted, such act is in derogation of the natural right which the owner of property has to use and enjoy his own as he sees fit, so long as it does not work such an injury to others as the law will take cognizance of. Therefore, one of the cardinal canons of construction when dealing with such covenants is to construe them strictly against the person in whose favor they are made, and liberally in favor of the freedom of the land. A violation of the covenant occurs only when there is a plain disregard of the limitation imposed by its express words. So, also, when the words used are as logically susceptible of a construction which would not violate the covenant, as of one which would violate it, the rule is to construe it so as not to constitute a violation. *Wood v. Stehrer,* 119 Md. 149, 86 A. 128; *Saratoga Corp. v. Stables Co.,* 146 Md. 152, 158, 128 A. 270; *Meredith v. Danzer,* 142 Md. 582, 121 A. 245; *Peabody Heights Co. v. Willson,* 82 Md. 186, 32 A. 386, 1077; *Beetem v. Garrison,* 129 Md. 665, 99 A. 897; *Bealmer v. Tippett,* 145 Md. 569, 125 A. 806; *Sowers v. Church of the Holy Nativity,* 149 Md. 434, 131 A. 785, 788; *Culp v. Firestone Co.,* 303 Pa. 257, 154 A. 479; *Downen v. Rayburn,* 214 Ill. 342, 73 N. E. 364; *Bartell v. Senger,* 160 Md. 685, 155 A. 174.

In *Sowers v. Church of the Holy Nativity, supra,* speaking through Judge Parke, we said: "The use of the lots will not be further incumbered, and their commercial utility and value affected, by raising, through unwarranted implication,

restrictions which it is the sound policy of the law to require to be plainly and unmistakably declared through the language of the document, when considered in connection with the circumstances surrounding the transaction and the object of the parties at the time of the creation of the restrictions." In interpreting words used to create restrictions, the court should endeavor to ascertain the real purpose and intention of the parties, and to discover this purpose from the surrounding circumstances at the time of the creation of the restriction, as well as from the words used. *Supra.* In endeavoring to arrive at the intention, the words used should be taken in their ordinary and popular sense, unless it plainly appears from the context that the parties intended to use them in a different sense, or that they have acquired a peculiar or special meaning in respect to the particular subject-matter. *Berry on Restrictions,* p. 65; *Easterbrook v. Hebrew Orphan Soc.,* 85 Conn. 289, 82 A. 561.

Keeping in mind these rules of construction, what, then, was the intention of the parties at the time they covenanted to "leave open and not build thereon," so that the said land covered by the restriction should "always remain open and not be built upon ?" It is clear that, if this language is given its broadest significance, the effect would be so to restrict this property as to practically deprive the owner of any substantial use thereof. Such a construction would prevent the erection or construction of a sundial, a bird bath, a coping, or even the laying of concrete on any portion thereof for a walk or driveway, as the doing of any of these things would result in the restricted area being technically "built upon"; and to construe literally, in its broadest sense, the term "leave open," would prevent the obstruction of the restricted area by a fence, shrubbery, flowers, or, indeed, anything not produced by nature unaided. Literally, to "keep open" would mean to keep entirely free from obstruction or incumbrance of any description. To attribute such an intention to the parties would be absurd. Considering all of the circumstances, and the language employed, the purpose of the parties seems clearly to have been to provide a space between the buildings

on each lot, twenty feet in width, thereby insuring to the occupants of each house air, light, and prospect. This object was to be attained by providing that the restricted area should be left open and not built upon, in the sense that no buildings should be erected thereon which would materially obstruct the free passage of light and air, or interfere with the view from either dwelling.

It is true that commonly we speak of fences as being "built," but it cannot be said that, when the fence is completed, it is a "building" in the common acceptation of that word. In our opinion, the words "not built upon" must be taken to mean not to erect any structure which would substantially interfere with the enjoyment of air, light and prospect. It is contended by the appellees that the restrictive words mean that they were intended to prevent the erection of structures similar to those permitted on the unrestricted part. We think this interpretation is too narrow, but that it does prevent the erection of only such structures as would be contrary to what we have found to be the intent and purpose of the parties, namely, the providing of a twenty-foot space without any structures thereon which could reasonably be said to deprive the occupants of either house of the benefits of air, light and view. Such construction will permit the erection of the proposed fence by the appellees and results in the reasonable enjoyment of their property without injuring the appellant or her property. The exhibit filed shows the appearance of this fence after its completion, which could not offend the esthetic sense of the most fastidious, but will permit the appellees to have the same character of use of their property as the appellant now has by reason of the laying of the concrete pavement on her restricted area. It would be difficult to distinguish between the character of use to which the two would then be put, the appellant using her restricted area as a service yard for automobiles, and the appellees using theirs for laundry purposes. It could hardly be contended that, without the erection of this fence, the appellees could not wash, dry and launder clothes thereon, and it must be apparent that without any screen shielding

such operations from the appellant's home it would be much more objectionable than the erection of the ornamental fence proposed.

It is also to be borne in mind that, at the time the parties entered into the covenant, the south line of the restricted area was marked by a high iron picket fence, which remained there for about seven years thereafter. While this is in no sense controlling, it is an indication that the parties did not regard a fence as being violative of the covenant. The proposed fence is on the rear forty feet of the lot, and at its nearest point is forty feet from the building of the appellant. What we here decide is that such a fence in the position proposed does not violate the restriction contained in the covenant. We are not to be understood as determining that an extension of such a fence, or any fence at all, on the dividing line of the property, would not be a violation. We are only here deciding that the injunction sought against the erection of the fence as now proposed was properly refused, for the reason that it does not interfere with the rights of the contracting parties sought to be secured by the covenants contained in the deed in question.

In the case of *Meaney v. Stork,* 80 N. J. Eq. 60, 83 A. 492, 494, it was said:

"I take it as firmly settled that a restrictive covenant, to be enforceable in equity, must be reasonable, and that the meaning to be attributed to it must be ascertained not only by a consideration of its language, but also by a consideration of the circumstances existing at the time of the creation of the covenant and its obvious purpose. It will be recalled that the language of the covenant with which we are dealing prohibits the erection 'on any lot of any building within ten feet of the line of the street * * * but shall keep said strip of land open and unincumbered, except that light, open fences, not more than six feet in height, may be built to inclose said strip as a courtyard, if so desired.' * * * 'Open,' in one sense, unquestionably means absolutely without obstruction; and 'unincumbered' may be properly used, in some connections, as meaning absolutely without anything

resting on or projecting over land. But when this whole covenant is read together I think its meaning is reasonably plain, and, further, that it is entirely plain that it cannot be given the broad construction contended for by the complainants. The obvious purpose of this covenant was to prevent the erection of a building within the ten feet. Every house was to have in front of it—that is, in front of its front line—ten feet of unbuilt-on property. It cannot be successfully argued that any such absurd result should be attributed to a construction of this covenant as to prevent that ten feet from having placed upon it anything. Surely, walks could be built through it, and to that extent the land would not be unincumbered. Little copings along the side of the walks to protect flower beds bordering the walks would surely not be within any reasonable construction of this covenant. And yet, if broadly construed, the walk itself and the coping or projection along the side of it, put there for protection, would be an 'incumbrance' in some use of that word, and probably would also cause the land not to be 'open'; that is, absolutely free of obstruction, within a broad and in some senses proper use of the word 'open.' I am of the opinion, on the one hand, that if the front of the building was ten feet from the line of the street, and then a covered porch projected from it onto the ten feet, that would be part of the erection of the building, and would violate the covenant. On the other hand, I am of opinion that it is within the meaning of this covenant to permit an approach by way of steps to rest on the said ten feet and I do not think that, in the proper sense of this covenant, such steps cause the said strip of land to be unopen and incumbered—that is, violate the provisions of the covenant that the said strip of land should be open and unincumbered. In other words, I incline to the opinion that the obvious purpose of the covenant was to have in front of each house a strip of land ten feet wide, across which the vision of the neighbors would be unobstructed, and that the prohibition was against the erection of anything upon or within the said ten feet which should prevent free observation across it. Read in this way, the

restriction is entirely reasonable; the obvious purpose of it is served, and the owner of each lot is not deprived unreasonably of a perfectly proper use of his property. Read in the broad way that the complainants insist it should be read, giving the most extreme meaning to each word of which each word is capable, the said strip of land would have to be left absolutely unimproved in any way, because anything placed upon it which nature had not placed there would then 'incumber' it, in the broadest sense of the word, and this is so entirely unreasonable that we discard it and search for the more reasonable construction."

What was there said with respect to the placing of steps, on the restricted ten-foot strip, which approached the porch and which were claimed by the complainants to be a violation of the covenant, is equally applicable to the case before us. When the appellees erect the fence proposed, in a strict sense the property will have been "built upon," and it cannot be literally said that it will then be "left open." Giving to each word its most extreme meaning, as in the case just quoted, the land would have to be left absolutely without improvement in any way, because anything placed upon it, other than that produced by nature, would prevent it from being entirely open, and any structure of any description erected upon it by man would, in the extreme sense, result in its being "built upon." Such a construction we are not able to follow, but will give it the more reasonable construction, which clearly was the purpose of the parties, and which results in an advantage to the appellees in the use of their property, without detriment to the appellant. For the reasons above indicated, the decree will be affirmed.

<em>Decree affirmed, with costs.</em>

---

PARKE, J., filed a separate opinion as follows:

In my judgment the affirmance of the decree should have rested upon a different ground. The covenant in question was that, along a common division line extending from the front of two adjacent lots to an alley in the rear, the respec-

tive owners of the two lots should leave open and not build upon a strip of ten feet in width on each side of the length of this boundary. The covenant was therefore mutual, and the two parallel, contiguous, and coterminous strips had a combined width of twenty feet; and the covenant was by the deed declared in terms to have been made so that the ten feet width of each adjoining strip of land should "always remain open and not be built upon." It is in my opinion irrefutably a breach of both the letter and spirit of this covenant for a foundation to be laid across one of these strips at the alley, and along the common property boundary line for a distance of about forty feet, and thence ten feet across said strip and parallel with the alley; and on this permanent foundation a brick wall to be put up to a uniform height of three feet, with brick posts rising three feet above this level, at intervals of eight feet, and a paling or lattice fence between these posts. The space thus inclosed, with the adjoining part of the lot, is to be used as a service yard for the hanging of clothes to dry and for other household purposes. When this structure is completed, the strip is certainly not open but built upon, in the teeth of the covenant, and so, when the construction is clear, the reasonableness, utility and esthetic value of the projected structure should make no weight against an adherence to the ordinary sense of the words selected by the parties to express a plain and sensible intention.

This construction would entitle the plaintiff to relief were it not that, with respect to the corresponding strip of ten feet on her own lot, she has been guilty of anterior but continuing and essential breaches of the terms of the covenant, which were not only similar in kind, if not in degree, but which were also contemporaneous in origin, and dependent upon, and concurrent and reciprocal with, those imposed upon the owners of the lot of the defendants. Under these circumstances, the bill of complaint for specific performance should have been dismissed because of the plaintiff's default. *Fry on Specific Performance* (6th Ed.), secs. 922, 957.